UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DUNN, | No. 2:11-cv-2731 JAM GGH P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| GARY SWARTHOUT, | |
| Respondent. | |

<u>INTRODUCTION</u>

Petitioner, a state prisoner proceeding pro se, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. On August 29, 2013, this court recommended denial of the habeas petition with respect to all issues except petitioner's claim of due process violation of his right to call witnesses at his disciplinary hearing. In regard to that issue, the court found that an evidentiary hearing was warranted. The district court adopted the findings and recommendations on October 23, 2013. Counsel was appointed for petitioner on December 16, 2013, and Stephanie Adraktas was substituted as appointed counsel on March 10, 2014. The evidentiary hearing was held on May 22, 2014. After hearing testimony from witnesses for both sides, as well as oral argument, the court now issues findings and recommendations in regard to the one remaining claim in this habeas case.

BACKGROUND[1]

Petitioner challenges a prison disciplinary guilty finding for fighting that resulted in 61 days of credit loss, but which more importantly for petitioner, could lead to a seven-to-fifteen-year denial by the Board of Parole Hearings (BPH). (Petition, at doc. no. 1, p. 1.)[2] 15 CCR 3005 (d) (the section which petitioner was found to have violated) provides in pertinent part that inmates shall not "willfully commit...an assault or battery...nor attempt or threaten the use of force or violence upon another person."

According to the Rules Violation Report, on May 11, 2010 petitioner and his cellmate, inmate Miller, were interviewed based on an anonymous note found in the outgoing mail. At the time of the interview, Petitioner Dunn had visible injuries consistent with having been in a fight. Petitioner admitted to having been in a physical altercation with Miller on May 8, 2010. A medical clearance was then conducted which indicated that petitioner had a bruised right eye and bruised right lower leg. Inmate Miller was then interviewed and he admitted to the physical altercation with petitioner, but did not recall the date. A medical evaluation of Miller was then conducted and he exhibited no injuries. Both inmates stated that this issue was resolved and agreed they could coexist on the same yard without further incident. (Petn., Ex. A.)

Petitioner insists that he was the victim of this attack, and that evidence included a declaration by one of his attackers which states that the incident had its roots in petitioner's refusal to fight with another Asian inmate, which then caused this incident at issue to occur. (Doc. no. 1 at 28.) Petitioner claims that his cellmate was ordered to attack him because he had refused to fight the Asian inmate who had reportedly struck or poked his finger in petitioner's

---

[1] Much of the background and discussion is repeated from the earlier findings and recommendations, issued August 29, 2013. (ECF No. 37.)

[2] Pursuant to Cal. Code Regs. tit.xv, § 2402(a), the BPH is required to determine petitioner's suitability for parole by considering: his "involvement in other criminal misconduct which is reliably documented;" his "behavior before, during, and after the crime;" and whether he "has engaged in serious misconduct in prison or jail." Cal. Code Regs. tit. xv, § 2402(b), (c)(6) (2010). Institutional behavior is given additional consideration because "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Id. § 2402(d)(9). Therefore, the BPH is required to consider petitioner's prison disciplinary record in determining his suitability for parole.

1  face. (Id. at 30-31.)

2     When petitioner was interviewed after the altercation, he was told by a sergeant that "he
3  could make 'this whole thing go away if we just signed a Marriage Chrono'" and that it would
4  just be placed in his C file. (Id. at 32.) If petitioner refused to agree to this resolution, he was
5  informed that he would be placed in the hole, and that when the investigative officer finished, it
6  would not look good for petitioner when he went before the BPH in a few weeks. When the
7  chrono was finally presented to petitioner to sign, he realized for the first time that he would be
8  receiving a 115. He was informed, "well you can sign it or you can go to the whole (sic)." (Id. at
9  33.)

10    Petitioner originally alleged various due process violations regarding the disciplinary
11 hearing and finding. (Id.) In the only reasoned opinion in the state courts, the Superior Court for
12 the County of Solano found some evidence to support the decision of the hearing officer in that
13 "[p]etitioner admitted to being in a physical altercation with Inmate Miller during an interview
14 with Officer Orgazan," and he signed the general chrono making the same admission. (Doc. no. 1
15 at 22.) The Superior Court also found that according to the CDC 115 RVR, petitioner did not
16 request any witnesses for his hearing, and that even if he had requested inmate Miller as a
17 witness, he failed to show prejudice. Furthermore, the court found that petitioner had provided no
18 evidence indicating the senior hearing officer was biased. Petitioner also failed to show that he
19 had exhausted administrative remedies regarding his claim that he should have been appointed an
20 investigative employee. (Id.)

21    Petitioner timely filed his federal habeas petition. The sole remaining ground for relief is
22 that the hearing officer denied petitioner due process rights by refusing to allow inmate Miller to
23 be a witness at petitioner's disciplinary hearing, both in writing and in person, despite petitioner's
24 written and oral request. [3] [4] This court's August 29, 2013 findings and recommendations found

---

[3] Other claims included petitioner's contention that there was ample evidence to demonstrate that he was the victim in this case and that the senior hearing officer ("SHO") should have appointed an investigative employee if he did not want to investigate the incident. Petitioner also alleged that the SHO was not impartial and had determined that petitioner was guilty before he entered the disciplinary hearing, based on his statement to petitioner denying the admission of Miller as a witness, and telling petitioner that he was guilty and that he was done with the hearing. (Id. at 45.)

3

that the Superior Court, by ignoring petitioner's declaration outlining his request for a witness and failing to conduct an evidentiary hearing to determine its credibility, made a factual determination based on only one piece of evidence, while ignoring other evidence, and was therefore unreasonable in finding that petitioner did not request witnesses at his hearing. The undersigned found that the Superior Court's decision was based on an unreasonable determination of the facts and not entitled to AEDPA deference pursuant to 28 U.S.C. § 2254(d)(2). The court accordingly found that an evidentiary hearing was warranted on this claim which it ordered be limited to: the receipt of testimony and/or evidence relevant to the issue of petitioner's claim of due process violation of his right to call witnesses at his disciplinary hearing, including the materiality of such testimony.

DISCUSSION

I. Standard of Review

In light of this court's previous ruling, this court must now decide this aspect of petitioner's remaining claim *de novo* under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012); Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003). If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a *de novo* review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering *de novo* the constitutional issues raised").

II. Applicable Law

A prisoner may challenge a prison disciplinary conviction by petition for writ of habeas corpus if the conviction resulted in the loss of good time credits because credits impact the duration of the prisoner's confinement. Preiser v. Rodriguez, 411 U.S. 475, 487-88, 93 S. Ct. 1827 (1973) (suit seeking restoration of good time credits was "within the core of habeas corpus

---

[4] According to the petition, the prison hearing officer also prevented petitioner from introducing a declaration signed by inmate Miller which stated that petitioner was indeed the victim.

4

1   in attacking the very duration of their physical confinement itself"). In dicta, the court in Preiser
2   noted that such a challenge is permissible even if restoration of the credits would not result in the
3   prisoner's immediate release from prison. Id.

4   "Habeas corpus jurisdiction also exists when a petitioner seeks expungement of a
5   disciplinary finding from his record if expungement is likely to accelerate the prisoner's
6   eligibility for parole." Bostic v. Carlson, 884 F.2d 1267, 1269 (9th Cir. 1989); see also Docken v.
7   Chase, 393 F.3d 1024, 1031 (9th Cir. 2004) ("[W]e understand Bostic's use of the term 'likely' to
8   identify claims with a sufficient nexus to the length of imprisonment so as to implicate, but not
9   fall squarely within, the 'core' challenges identified by the Preiser Court.")

10   While prisoners may not be wholly deprived of their constitutional rights, "there must be
11   mutual accommodation between institutional needs and objectives and the provisions of the
12   Constitution... ." Wolff v. McDonnell, 418 U.S. 539, 556, 94 S. Ct. 2963 (1974). "Prison
13   disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due
14   a defendant in such proceedings does not apply." Id. A prisoner's due process rights must be
15   accommodated to the "legitimate institutional needs" of a prison. Bostic v. Carlson, 884 F.2d
16   1267, 1269 (9th Cir.1989), citing Superintendent, etc. v. Hill, 472 U.S. 445, 454-455, 105 S. Ct.
17   2768 [] (1984). With respect to prison disciplinary proceedings, the minimum procedural
18   requirements that must be met are: (1) written notice of the charges; (2) at least 24 hours between
19   the time the prisoner receives written notice and the time of the hearing, so that the prisoner may
20   prepare his defense; (3) a written statement by the fact finders of the evidence they rely on and
21   reasons for taking disciplinary action; (4) the right of the prisoner to call witnesses and present
22   documentary evidence in his defense, when permitting him to do so would not be unduly
23   hazardous to institutional safety or correctional goals; and (5) legal assistance to the prisoner
24   where the prisoner is illiterate or the issues presented are legally complex. Id. at 563-71.
25   Confrontation and cross examination are not generally required. Id. at 567.

26   In addition, due process requires that the decision be supported by "some evidence."
27   Superintendent v. Hill, 472 U.S. at 455, 105 S. Ct. 2768, citing United States ex rel. Vajtauer v.
28   Commissioner of Immigration, 273 U.S. 103, 106, 47 S. Ct. 302, 71 L.Ed. 560 (1927). In Hill,

the United States Supreme Court explained that this standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced ..." Id. "Ascertaining whether this standard is satisfied does not require an examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." Hill, 472 U.S. at 455-456. Instead, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Id.

The Hill Court provided justification for the less demanding standard:

> We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. [] The fundamental fairness guaranteed by the Due Process Clause does not require the courts to set aside decisions of prison administrators that have some basis in fact. [] Revocation of good time credits is not comparable to a criminal conviction, [] and neither the amount of evidence necessary to support such a conviction, [] nor any other standard greater than some evidence applies in this context.

Id. at 456 [citations omitted].

"The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." Hill, at 457. Even where the evidence as in Hill "might be characterized as meager," if "the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary," those findings must be upheld. Id. Therefore, if the procedures outlined above are afforded to a prisoner, and "some evidence" supports the decision of the hearing officer decision, the requirements of due process are met. Hill, 472 U.S. at 455; Bostic v. Carlson, 884 F.2d at 1269-1270.

III. Analysis

In the August 29, 2013 findings and recommendations, this court summarized the failure to call a witness claim as follows:

> In regard to Ground One, petitioner argues that Miller signed a declaration, dated May 17, 2010, stating that Miller was ordered by a group of white people from Sacramento to attack Dunn because he refused to get into a physical altercation with someone from another race. Because Miller was Dunn's "bunky,"

6

he was ordered to do the "roll-up." He then tried to use force to make Dunn roll-up, but Dunn refused. Miller then states: "[I] used common sense reasoning until I understood just what the situation really was." Miller then explained the situation to the group who had ordered the attack and the issue was resolved. (Miller Dec., doc. no. 1 at 57.)

According to petitioner's declaration, he presented Miller's declaration to the Senior Hearing Officer who "looked at it for a few minutes and said, 'Fuck that this ain't nothin but prison politics, Your [sic] guilty.' Dunn then told the SHO he would go out and get Miller, who was waiting in the hallway, so he could verify that he agreed with the contents of the declaration. The SHO then said, 'No, we are done here.'" (Dunn Dec., doc. no. 1 at 45.)

The RVR submitted by respondent states that both a staff assistant and investigative employee were waived by petitioner, and that petitioner did not request any witnesses at his hearing. (Answer, Ex. 4.) The aforementioned declaration by Miller is not mentioned in the RVR.

Petitioner argues that under California law, the SHO was required to call his requested witness, Miller, unless he has a legitimate penalogical purpose for not doing so. The specific reason for not permitting the witness must be in writing with a copy to the prisoner. (Doc. no. 1 at 40.) Petitioner argues that the SHO violated due process by failing to call a witness that he knew could have absolved petitioner.

In a separate briefing to the superior court during the exhaustion process, petitioner had argued that he only admitted to the physical altercation because he was threatened with going to the hole if he did not. (Doc. no. 1 at 25.) In this filing, petitioner also explained that at the time he signed the RVR stating he did not request witnesses, he was not sure if anyone would testify on his behalf, and it was not until the next day that Miller agreed to sign a declaration and testify. (Id.) In his petition, petitioner argues, "[t]he SHO conveniently waited until petitioner had signed all of the necessary forms waiving his right to have a witness present, as he was instructed to do, before he looked at the declaration, then final[l]ly stating 'Fuck this, this aint nothing but prison politics, your guilty.' [Sic.] Petitioner then again asked to have Miller brought back in, because he was standing right outside. The SHO denied the request by saying 'we are done here.'" (Doc. no. 1 at 42.)

The pertinent text of petitioner's declaration bears repeating:

> After I finished signing the papers, as I was instructed to do, and while Lt. Fecht was examining the Declaration, I told him if he did not believe what was in the declaration, he could call Inmate Miller back in and ask him[] because he had just held his hearing on the same RVR 115. Also, when I passed Miller on the way into the Lieutenant's

7

> office, I told him to wait outside, because they might be calling him back in as a witness. After a short delay in which it, somewhat, appeared to me that he was rather agitated, he said "Fuck this, this aint nothing but prison politics. your guilty" [Sic.] *I then again asked him to call Miller back in* to verify that he agreed with what was stated in the declaration. At that point he said we are done here, and adjourned the hearing.
>
> (Petitioner's Decl., Doc. no. 1 at 45.) (emphasis added.) This identical declaration was presented to the state superior court. (Doc. no. 24-1 at 25.)

(Doc. No. 37 at 10-11.)

The undersigned then found that the Superior Court did not mention petitioner's declaration, and therefore its decision was not based on a reasonable determination of the facts. Instead, the Superior Court based its decision on a Rules Violation Report stating that no witness was requested, in direct contradiction to petitioner's declaration which was before the court. The court's finding that even if petitioner had requested Miller as a witness, he did not show prejudice, was also contradicted by petitioner's declaration indicating his refusal to fight, as well as Miller's potential testimony that petitioner did not fight back against Miller's attack. Without a conclusive state court record on this issue, this court determined the record was inconclusive without an evidentiary hearing, and the Superior Court's failure to conduct one violated petitioner's right to develop the record supporting his claim. (Id. at 13, 17.)

At the May 22, 2014 evidentiary hearing, petitioner testified to the facts as set forth in his petition, that Miller attacked him pursuant to an order from an inmate group, and that petitioner did not fight back. Petitioner testified that he originally denied being in the fight because the correctional officer who first asked him about it did so in front of other inmates, and petitioner did not want to be labelled a snitch by the inmates. He concedes that he signed the "marriage chrono" a few days later because he was told by the sergeant that this is what would make it "go away," and petitioner thought it would just go in his file. See ECF No. 1 at 53. He then signed the RVR 115 because he was threatened with administrative segregation if he refused. See id. at 47-50. He did not request inmate Miller as a witness when first asked, because he had not talked to Miller about it and did not know how Miller would respond. Miller later signed the

1    declaration, which petitioner presented to Lt. Fecht, and told this SHO that Miller was waiting

2    outside and could testify if the SHO did not believe him.  That is when Fecht denied him the

3    witness, and made the remark that it was "prison politics" and petitioner was guilty.

4          Petitioner testified that although he was assessed 61 days of credit loss, he filed this action

5    because he was much more concerned about the ramifications that a disciplinary conviction

6    would have on a future parole board hearing.  He testified that he checked the box stating that no

7    witnesses were requested during his disciplinary hearing, but he explained that he was under the

8    impression that it would be dismissed because he had not been through such a hearing before, that

9    Lt. Fecht told him to initial "here, here and here," and that he did not read what he was initialing.

10         Corie Miller next testified that on the date of the incident, he was ordered to beat

11   petitioner up, and he did so.  Petitioner did not fight back.  Miller testified that he signed a

12   marriage chrono so he would not have to go to the hole as threatened by the officer who presented

13   it to him.  He thought that this would resolve the incident.  He testified that at first he did not

14   admit to attacking petitioner.  Miller testified that the officer did not believe him, and noted

15   petitioner's black eye and Miller's hand (after he had used it to punch petitioner).  He later signed

16   a declaration admitting to the attack, and he testified that this declaration reflects what really

17   occurred.  He was waiting outside petitioner's disciplinary hearing, and testified that if called in

18   as a witness, he would have told the truth, that he attacked petitioner, and that petitioner did not

19   fight back and did not have the chance to fight back, so long as he would not have to reveal the

20   names of the inmates who ordered the attack, because he did not want to be "in trouble with the

21   home boys on the yard."

22         Lt. Fecht then testified for respondent.  He did not recall petitioner's disciplinary hearing,

23   and testified that he has adjudicated over a thousand hearings.  He was then questioned about his

24   custom and practice.  He testified that a defendant may request a witness on the day of the

25   hearing, but that he will determine if the proposed testimony is relevant and will only permit the

26   witness if he so decides.  If he denies the witness based on irrelevance, his custom and practice is

27   to annotate that the witness was denied because the testimony was not relevant to the case at

28   hand, without further explanation.  Based on his review of petitioner's record, this officer testified

that if he had heard Corie Miller's testimony, he would have found petitioner guilty in any event because petitioner made a partial admission in the marriage chrono that he was guilty, and that all the other evidence outweighed Miller's declaration and possible testimony. As Lt. Fecht did not remember this case, petitioner's attorney asked this witness how many times he had denied a witness based on relevance. He thought he had possibly done so more than a hundred times, but did not know for sure. The standard of relevance he utilizes is in the Senior Hearing Officer's Manual, but he did not recall what the manual stated on the topic of relevance.

When showed the marriage chrono signed by petitioner and inmate Miller, Lt. Fecht confirmed that he considered the statement, "Dunn admitted to being involved in a physical altercation with his Bunkie (Miller) on May 8, 2010…." in making his guilty finding. (ECF No. 1 at 53.) He also considered the statement in the anonymous note which led to the marriage chrono, "The white boys in 14-J-7 and 14T-3 got into a fist fight with the Asians in 14-B-2 and 14-B-3. You need to check out the white boy in 14-J-7-L." (Id.) Petitioner was the inmate housed in cell 14-J-7-L. (Id. at 50.)

Lt. Fecht testified that the general practice is to view signatures on a marriage chrono as a partial admission of guilt. On further cross-examination, however, Fecht, conceded that the marriage chrono contains no language stating that by signing this document the parties are admitting guilt. Based on Fecht's testimony, it appears that he assigned a certain meaning to the term, "physical altercation" as used in the marriage chrono. After being questioned as to the meaning of the term and when it is used, Lt. Fecht testified that an investigation would reveal if an altercation was an ambush where there is clearly one aggressor and a victim, and a typical fight where both inmates are engaged in the fighting. If both inmates admit that they were in an altercation, that they both fought, and they agree to signing a marriage chrono, then they both receive a Rules Violation Report. Fecht conceded that even in situations where one inmate ambushed another inmate, they might both admit to a physical altercation and sign a marriage chrono in order not to point the finger at the other inmate. In this specific case, Lt. Fecht stated that he received the marriage chrono in preparation for petitioner's disciplinary hearing, and considered it as a partial admission of guilt, even before the hearing started. He further

considered the anonymous note regarding the fight, and the medical evidence of petitioner and Miller's physical condition.

Even though he testified it was possible that petitioner was attacked, based on petitioner's injuries and the lack of signs of injury on Miller's person, he believed it was also possible that it was mutual combat, and described another case in which there were physical signs on only one inmate, yet it was found to be a case of mutual combat.  Fecht testified he does not think petitioner failed to fight back based on the dynamics of being in prison.  The fact that petitioner was the only inmate who showed signs of injury did not cause Lt. Fecht to doubt his impression of mutual combat.  To determine if an inmate fought back or not, Lt. Fecht testified that he interviews the involved parties and other witnesses.  He then testified that he did not interview inmate Miller, and therefore did not ask him whether petitioner fought back.  He seemed to rely instead on the anonymous note and C/O Orgazan's interviews, and the fact that petitioner did not request any witnesses.

Lt. Fecht testified that there was no declaration by Corie Miller in the records before him at the disciplinary hearing.  In contrast, upon questioning by the court, petitioner stated that he gave the declaration to Lt. Fecht, who gave it back to him with the statement regarding "prison politics" and "we're done here."

The testimony taken at evidentiary hearing points out many problems with the way this disciplinary hearing was handled and confirms that an evidentiary hearing was required.

As the undersigned stated in the August 29, 2013 opinion regarding the need for evidentiary hearing, and confirms after evidentiary hearing:

> The SHO made a reflexive "prison politics" statement, if petitioner is to be believed, without the least bit of effort to describe why, in this case, he believed that.  Certainly, not every witness statement in prison is "prison politics;" if such were the case it makes no sense to have hearings at all, i.e., we all know what the final result will be before the hearing is held.  Nor is the court finding that disciplinary hearing officers have to hold trial like proceedings.  Prison is a very busy place, and hearing officers are tasked with a multitude of duties, each one competing for the officer's time.  However, there does come a time when a little effort must be expended in fairness sake.  Not only was the live witness right outside the door ignored, the officer made no credibility findings except for his generally held belief that apparently all witness

11

> statements exonerating an inmate are pure "politics," not even worthy of a question or two. While it may certainly have been possible that "prison politics" were the genesis of Miller's declaration and potential live testimony, the officer had a duty to specify, why in this case, such was so. Therefore, no inferences in favor of the Superior Court's factual decision can be made from this record.
>
> Without citation to the governing CCR, 15 CCR 3005 (the section with which petitioner was found to have violated), the Superior Court also found that if the declaration/potential testimony was accepted, the evidence therein was immaterial. The undersigned cannot agree. Section 3005 (d) provides in pertinent part that inmates shall not "willfully commit...an assault or battery...nor attempt or threaten the use of force or violence upon another person." Being a victim in an assault, if petitioner's witness is to be believed, or fending off an attacker's blows, does not qualify as assault/battery on the attacking inmate, nor does simply defending oneself from injury qualify as the "willful" "attempted" use of force or violence on another person. An interpretation that one must simply acquiesce in a beating, to the point of serious injury or death, would lead to serious substantive due process concerns. Miller's testimony, again, if believed, demonstrates much less than a "mutual combatant" situation. On its face, the Miller testimony is quite material.

(ECF No. 37 at 16-17.)

At the evidentiary hearing, petitioner's testimony that he tried to give Miller's declaration to Lt. Fecht but was rejected, and requested Miller as his witness, is credible. There is no reasonable explanation why Miller's declaration was not made part of the disciplinary hearing record, even if petitioner's request for Miller as a witness was denied. Respondent indicated at the hearing that Miller's declaration was not presented at the disciplinary hearing because it was not made part of that record; however, there is no evidence that petitioner did not try to present the declaration to Lt. Fecht. To so find, the court would have to find that petitioner fabricated this part of his facts, and there is no indication that he did so. On the other hand, if Lt. Fecht had made the declaration part of the record, then his guilty finding would be objectively unreasonable and would not be based on the evidence presented. Therefore, it is reasonable to conclude that the facts are as petitioner presents them, that he handed Lt. Fecht the declaration and offered Miller as a witness, and that this SHO read the declaration and handed it back to petitioner with the comment, among others, regarding "prison politics" and the statement, "you're guilty."

/////

The only witness adverse to petitioner at the evidentiary hearing was Lt. Fecht, who had no recollection whatsoever of this disciplinary proceeding, but could only speak to his custom and practice, which included consideration of a marriage chrono and his belief that it constituted a partial admission of guilt. Where the marriage chrono was obtained by threats from correctional officers that the inmates would go to the hole if they did not sign it, or that the "whole thing would go away" if the inmates signed it, it did not constitute reliable evidence of anything, let alone guilt. Furthermore, this marriage chrono states only that the inmates were involved in a "physical altercation," the meaning of which is unclear. The term could include mutual combat or an ambush and attack upon a victim who does not fight back, which should result in two quite different consequences.[5] It should not be legally dispositive of anything based on the manner in which it was obtained and the vagueness of the terms used in this document; Lt. Fecht's reliance on it as a partial admission of guilt, even before the hearing began, was not reasonable. His further reliance on an anonymous note stating only that the white inmates in petitioner's cell got into a fight with Asian inmates in another cell, and to check out the white boy in [petitioner's bunk], was not reasonable, when he refused to consider the sworn declaration or live testimony of Miller, the actual inmate who was involved in the altercation, and could provide details, unlike the anonymous note which describes only vaguely a "fist fight" with no mention of whether or not the author of the note was a witness.

In fact, the only evidence before Lt. Fecht is that a physical altercation took place, which alone is not sufficient for a guilty finding of fighting, especially in light of the physical evidence showing petitioner had signs of being attacked, while Miller had no physical evidence of injuries to his person. The physical evidence at the time of the incident in the form of a 7219 medical

---

[5] The term "physical altercation" is defined as "a confrontation, tussle or physical aggression that may or may not result in injury. Physical altercations are distinguished from verbal altercations by the use of physical force or contact. It may also be referred to as bullying, fighting, or battery." http://definitions.uslegal.com/p/physical-altercation/. The term "fighting," which was the charge against petitioner in the RVR, connotes mutual combat which is defined in the 8th edition of Black's Dictionary as "[a] consensual fight on equal terms-arising from a moment of passion but not in self-defense-between two persons armed with deadly weapons." Black's Law Dictionary (8th ed. 2004).

clearance, reveals that petitioner had a bruised right eye and bruised right lower leg while examination of inmate Miller revealed no injuries. (Answer, Ex. 4 at 2.) Also worth considering were the respective ages of petitioner and inmate Miller, 57 and 19 at the time. Based on this direct evidence, fighting or mutual combat is precluded as a reasonable finding, and an inference that petitioner was attacked is a more reasonable one. More importantly, both inmates involved in the altercation were consistent in their testimony that petitioner was attacked by Miller and did not fight back.

Moreover, Lt. Fecht's testimony was not entirely credible. He testified that he did not recall this event but when a hypothetical was posed to him regarding policy and practice, he responded with details regarding this incident, indicating that he did remember it. His testimony that he decides to admit witnesses or evidence into the disciplinary hearing only if he determines they are relevant, is left to his subjective determination, and in this case it was not objectively reasonable to determine that Miller's proposed testimony was not relevant. Lt. Fecht's aura and demeanor were such that it is believable that he could have reacted to petitioner's request for a witness in exactly the manner described by petitioner.

It is true that on the more specific issue of whether prisoners have a right to self-defense in disciplinary hearings, the trend seems to be that there is no due process violation. The Supreme Court has not addressed the issue of whether prisoners have a right to self-defense or can rely on a theory of self-defense in disciplinary proceedings, and the undersigned cannot find citable Ninth Circuit authority. [6]

Other circuits have determined that, in the prison setting, an inmate's actions are not given immunity because they were conducted in self-defense. For example, see Scruggs v. Jordan, 485 F.3d 934, 938–39 (7th Cir.2007) (stressing that inmates do not have the substantive right to raise self-defense as a complete defense in prison disciplinary proceedings); Brown v. Wyoming Dept.

---

[6] In an uncitable case because of its unpublished status prior to 2007, the Ninth Circuit Court of Appeals noted that a prohibition on the right to raise self-defense in a disciplinary hearing would not violate a prisoner's due process rights. MacMillan v. Pontesso, 73 Fed. Appx. 213, 214 n. 1 (9th Cir.2003) ("Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply," Wolff, 418 U.S. at 556.)

of Corrections State Penitentiary Warden, 234 Fed. Appx. 874, 880 (10th Cir. 2007) ("this [self-defense] argument is simply another way to challenge the disciplinary committee's determination that [the inmate petitioner] committed the prohibited acts, and we have already concluded that a reasonable jurist would conclude that 'some evidence' supports that decision."); Kenney v. Barron, 239 Fed. Appx. 494 (11th Cir. 2007) (holding that prison officials' failure to disclose a report concluding inmate acted in self-defense did not violate prisoner's due process rights); and Williams v. Kort, 223 Fed. Appx. 95, 100 (3d Cir.2007) (agreeing with Rowe v. DeBruyn, 17 F.3d 1047, 1052–53 (7th Cir.1994), that "prisoners do not have a constitutional right to self-defense"). Indeed, this district has previously refused to sanction a self-defense rule. Chavez v. Parano, 2013 WL 1694481 (E.D. Cal. Apr. 18, 2013).

Most of the authority which discounts the ability of prisoners to defend themselves, not having instigated the confrontation or otherwise been the aggressor in whole or in part, stems from the case of Rowe v. DeBruyn, 17 F3d 1047 (7th Cir. 1994). The divided court found "no precedent" for a constitutional right for prisoner self-defense, and based its judgment on a presumed deterrent effect to fighting precluding the setting forth any such rule. That is, a prison was justified in promulgating a no self-defense policy because to allow self-defense would "encourage more violence." Id. at 1052-1053. "It acts as a didact by warning prisoners that violence against another inmate is a unilaterally condemned and perpetually sanctionable violation of prison rules. It also acts as a deterrent because a prisoner who is caught fighting cannot reliably exculpate himself later with a claim of self-defense." Id.

However, the dissent in that case had the better argument from a substantive due process standpoint:

> It [the majority opinion] sanctions the decision of the state government of Indiana to require that any person incarcerated under its authority submit, no matter what the circumstances, to any threat to life or bodily integrity without any recourse to self-defense of any kind. This holding renders the phrases of *Wolff* meaningless poetry.
>
> ****
>
> There must be a demonstration on the part of the prison authorities that the deprivation in question is indeed "reasonably related to

> legitimate penological interests" of the corrections system. <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The principal reason offered by the majority has a superficial appeal. The absence of self-defense, it maintains, fosters a peaceful environment within the prison walls because it acts as a deterrent to all violence. A prisoner caught fighting, it reasons, cannot reliably exculpate himself later with a claim of self-defense. Yet, we are told in the following sentence, a prisoner can claim self-defense in mitigation of punishment, thus, it would seem, destroying a good deal of the supposed deterrent.
>
> The difficulty with the majority's position is its assumption that the self-defense afforded to prisoners would have to be the same as that available in the general community and could not take into consideration the difficult circumstances of modern prison life. It may well be that self-defense in the prison environment ought to be available as a defense of extreme last resort and available only when the prisoner can establish that he cannot rely on the state to protect him, a situation that, the cases of this court make clear, occurs with some frequency. But to forbid all resistance to all threats to life and bodily integrity is not to ensure a lack of violence, as the majority suggests, but to leave the weak and the vulnerable the easy prey of the strong and the vicious. It is indeed a novel proposition of constitutional law to hold that a state, having deprived a person of liberty according to law, can further punish that individual for attempting to stay alive, even when the state itself is not ready, willing, or capable of assuming that responsibility by substituting its own strong arm for that of the prisoner-victim.

<u>Rowe</u>, 17 F.3d at 1055-1056 (Ripple, J., dissenting).

  Clearly, Judge Ripple's position makes sense. In the situation where there are, on the one side, a pure aggressor, and on the other, a victim only, it does nothing to deter violence in prison by not allowing the victim to survive by defending himself. The aggressor, by definition, is not deterred in the slightest by the "no defense" rule. Rather, the preclusion of any self-defense sets up a situation where the aggressor, undeterred from the get-go, knows he may come out of any instigated violence physically unscathed. What does that do to stop the violence in the first place?

  Yes, many fights take place outside the sight of the prison officials, and a self-defense rule would be subject to manipulation by the prisoners. However, the undersigned would place the burden of proof upon the prisoner claiming self-defense, and that proof would have to be substantial. It would have to include substantial evidence that the victim was not responsible for

the fight in any significant way.  And yes, the undersigned is well aware that prisoners' constitutional rights are not the same as in the outside world—that prison officials have special conditions to deal with which often involve curtailing rights.  But in the final analysis, just because prison administrative justifications are a reason to "infringe" constitutional rights in prison, see Turner v. Safley, such practical necessities do not justify the wholesale swallowing of those  rights.

Thus, under the undersigned's analysis, testimony bearing on the pure self-defense of a victim would be relevant under any sense of that word, and the simple refusal to ever permit such testimony infringes on the Wolff requirement that prisoners be permitted to call witnesses when that calling would not itself endanger the safety of the prison institution.

However, petitioner's position in this case, posited by the Miller evidence, is even one step further up the ladder from self-defense, i.e., the evidence he desired to present demonstrates that he did not even attempt to defend himself.  To apply a "*mutual* combat" description to a situation where the prisoner simply allows himself to be preyed upon when attacked gives rise to the *Alice in Wonderland* situation where words can mean whatever one wants them to mean regardless of their ordinary usage.

In a state habeas case pertaining to a slightly different section of Title 15 of the California Code of Regulations, "[m]utual combat with no serious injuries where the aggressor cannot be determined," the court affirmed the granting of the writ.  In re Mardis, 2010 WL 5177547 (Cal. App. 2010).  Section 3323 is comprised of two components:  "1) an inmate's involvement in mutual combat; and 2) the inability of prison authorities to determine who the aggressor was."  This charge seems custom-made for the incident in this case; however, petitioner was charged instead with § 3005(d), which prohibits the use of force or violence.  The facts, however, are very similar.  The court analyzed them as follows:

> The People's argument for reversing the superior court's granting of Mardis's petition is not persuasive because it addresses only the first element. Further, we conclude there is no evidence in the record that supports a finding that the prison authorities were unable to determine whether Mardis or Hill was the aggressor in the underlying altercation. Although no officer actually saw the altercation between Mardis and Hill, prison authorities had two

17

>   cooperative witnesses in Mardis and Lewis who provided them with detailed statements.  The statements by Mardis and Lewis pointed to Mardis's failure to lend Hill a chess set as the motivation for Hill assaulting Mardis and clearly identified Hill as the aggressor. Further, their depiction of Hill as the aggressor was corroborated by the medical records, which showed that Mardis suffered injuries that appeared to be consistent with their version of events, i.e., that the actual altercation between Hill and Mardis began when Hill struck Mardis in the head with a cane and that after Mardis wrestled the cane away, Hill grabbed Mardis and slammed him to the ground.  Accordingly, since the record does not contain any evidence in support of at least one of the elements of the offense Mardis was charged with, we find no basis to reverse the trial court's granting of Mardis's petition.

Id. at *3.  In Mardis, the court considered evidence which indicated that "mutual" combat did not take place, and the same result should obtain here.

Therefore, the refusal by the hearing officer to permit a witness to testify, either by way of declaration or live testimony that petitioner Dunn was attacked and did not fight back, demonstrated that the basic minimum procedural protections under Wolff were not provided to petitioner.  When the end result of a guilty finding at a disciplinary hearing results in the practical effect of a no parole sentence because the disciplinary finding will in effect negate any chance of parole, more than a scant few minutes can be spent at the disciplinary hearing. The writ should be granted.

CONCLUSION

For the reasons stated herein, IT IS RECOMMENDED that:

1.  Petitioner's application for a writ of habeas corpus be granted; and

2.  Respondent be ordered to provide a new disciplinary hearing for the event at issue, before a different hearing officer.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file

1  objections within the specified time may waive the right to appeal the District Court's order.

2  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  Dated: July 15, 2014

4  <u>/s/ Gregory G. Hollows</u>

5  UNITED STATES MAGISTRATE JUDGE

8  GGH:076/Dunn2731.hc